

## Fourth Court of Appeals
### San Antonio, Texas

**MEMORANDUM OPINION**

No. 04-20-00351-CV

**IN THE INTEREST OF T.E.C.**, I.A.C., and M.R.C., Children

From the 408th Judicial District Court, Bexar County, Texas
Trial Court No. 2018-PA-01552
Honorable Angelica Jimenez, Judge Presiding

Opinion by:     Liza A. Rodriguez, Justice

Sitting:         Rebeca C. Martinez, Chief Justice
                 Patricia O. Alvarez, Justice
                 Liza A. Rodriguez, Justice

Delivered and Filed: January 6, 2021

AFFIRMED

Mother and Father appeal the trial court's order terminating their parental rights to their children T.E.C., I.A.C., and M.R.C.[1]  Both parents argue the evidence is legally and factually insufficient to support the trial court's predicate findings under section 161.001(b)(1).  Mother also challenges the trial court's finding that termination is in the children's best interest and its conservatorship finding.  TEX. FAM. CODE ANN. § 161.001(b)(1), (2).  We affirm.

### BACKGROUND

Mother and Father have three children together who are the subject of this case: T.E.C., a five-year old boy; I.A.C., a three-year old girl; and M.R.C., a two-year old boy.  Mother was 17

---

[1] To protect the identity of the minor children, we refer to the parties by fictitious names, initials, or aliases.  *See* TEX. FAM. CODE ANN. § 109.002(d); TEX. R. APP. P. 9.8(b)(2).

years old and Father was 39 years old when they began living together. Father's daughter with a different mother, eleven-year old A.C., also lived with the family. Father's parental rights to A.C. were terminated in a separate case. The Department of Family and Protective Services filed its petition in this case on July 16, 2018 based on a referral alleging domestic violence between the parents and physical abuse of the children and an investigation finding "reason to believe" the allegations. While the safety plan arising from the first referral was in effect, infant M.R.C. was treated in the hospital for a skull fracture, which led to a second referral for physical abuse. At that time, the children were removed and placed in the Department's custody.

A multi-day bench trial was held during January 2020. The trial court abated the trial for four months at the end of January and during that time also imposed additional family services on Mother and Father. Trial resumed on June 12 and concluded on June 22, 2020. In addition to the admission of multiple exhibits, twenty-two witnesses testified at trial, including several Department caseworkers, counselors, the CASA volunteer, the foster placements for the children, family members, and Mother and Father. At the conclusion of trial, the trial court found the following predicate grounds for termination: both types of endangerment under subsections (D) and (E) against Mother and Father; failure to complete the service plan (the additional family services) under subsection (O) against Mother and Father; and drug use under subsection (P) against Father. *Id.* The court further found that termination of the parental rights of Mother and Father is in the children's best interest and appointed the Department as sole managing conservator of the three children. *Id.* The trial court dismissed the request for relief by the children's paternal great uncle and his husband, the current placement for the children, who intervened in the case (the "Intervenors"). An amended final termination order was signed on July 23, 2020. Mother and Father appeal.

## STANDARD OF REVIEW

To terminate parental rights pursuant to section 161.001 of the Texas Family Code, the Department has the burden to prove by clear and convincing evidence that parental rights should be terminated pursuant to one of the predicate grounds in subsection 161.001(b)(1) and that termination of parental rights is in the best interest of the child. TEX. FAM. CODE ANN. § 161.001(b)(1), (2). In reviewing the legal sufficiency of the evidence to support these findings by the trial court, we look "at all the evidence in the light most favorable to the finding to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true." *In re J.O.A.*, 283 S.W.3d 336, 344 (Tex. 2009) (quoting *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002)). In reviewing the factual sufficiency of the evidence, we consider the disputed or conflicting evidence. *Id.* at 345. "If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient." *Id.* (quoting *In re J.F.C.*, 96 S.W.3d at 266). Under these standards, the trial court is the sole judge of the weight and credibility of the evidence. *Id.*

## PREDICATE GROUNDS: ENDANGERMENT UNDER (D) AND (E)

Mother and Father argue on appeal that the evidence is legally and factually insufficient to support the trial court's endangerment findings against each of them under subsections (D) and (E). TEX. FAM. CODE ANN. § 161.001(b)(1)(D), (E). When a parent raises an appellate issue challenging findings under subsection (D) and/or subsection (E), we must address those grounds even if there are other predicate grounds because of the potential future consequences for parental rights to another child. *In re N.G.*, 577 S.W.3d 230, 235 (Tex. 2019) (an endangerment finding under (D) or (E) may be used in a future termination proceeding involving a different child; therefore, if challenged on appeal, (D) and (E) must be reviewed regardless of whether sufficient

evidence exists to support another predicate ground). Here, the trial court found grounds (D) and (E) against both Mother and Father.

Subsection (D) permits termination of parental rights if, along with a best-interest finding, the factfinder finds by clear and convincing evidence that the parent "knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endanger the physical or emotional well-being of the child." TEX. FAM. CODE ANN. § 161.001(b)(1)(D). Under subsection (D), the trial court examines "evidence related to the environment of the children to determine if the environment was the source of endangerment to the children's physical or emotional well-being." *In re J.T.G.*, 121 S.W.3d 117, 125 (Tex. App.—Fort Worth 2003, no pet.). "Conduct of a parent in the home can create an environment that endangers the physical and emotional well-being of a child." *Id.* "For example, abusive or violent conduct by a parent or other resident of a child's home may produce an environment that endangers the physical or emotional well-being of a child." *Id.* "Parental and caregiver illegal drug use and drug-related criminal activity likewise supports the conclusion that the children's surroundings endanger their physical or emotional well-being." *Id.* "A child is endangered when the environment creates a potential for danger that the parent is aware of but consciously disregards." *In re C.J.G.*, No. 04-19-00237-CV, 2019 WL 5580253, at *2 (Tex. App.—San Antonio Oct. 30, 2019, no pet.) (mem. op.) (quoting *In re S.R.*, 452 S.W.3d 351, 360 (Tex. App.—Houston [14th Dist.] 2014, pet. denied)). "[A] parent need not know for certain that the child is in an endangering environment, awareness of such a potential is sufficient." *Id.* (quoting *In re R.S.-T.*, 522 S.W.3d 92, 109 (Tex. App.—San Antonio 2017, no pet.)).

Subsection (E) permits termination of parental rights if the trial court finds by clear and convincing evidence that the parent "engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the

child." TEX. FAM. CODE ANN. § 161.001(b)(1)(E). Under subsection (E), the trial court must determine "whether there is evidence that a parent's acts, omissions, or failures to act endangered the child's physical or emotional well-being." *In re C.J.G.*, 2019 WL 5580253, at *2.

Under both subsections, "endanger" means "to expose a child to loss or injury, or to jeopardize a child's emotional or mental health." *Id.* at *3 (citing *In re M.C.*, 917 S.W.2d 268, 269 (Tex. 1996)). "However, there are some distinctions in the application of subsections (D) and (E)." *Id.* (citation omitted). Termination under subsection (D) may be based upon a single act or omission. *Id.* at *3 (citing *In re R.S.-T.*, 522 S.W.3d at 109). In contrast, termination under subsection (E) "may not rest on a single act or omission; it must be 'a voluntary, deliberate, and conscious course of conduct.'" *Id.* (quoting *Jordan v. Dossey*, 325 S.W.3d 700, 723 (Tex. App.—Houston [1st Dist.] 2010, pet. denied)). Additionally, "[i]n evaluating endangerment under subsection D, we consider the child's environment *before* the Department obtained custody of the child." *Id.* (quoting *In re S.R.*, 452 S.W.3d 351, 360 (Tex. App.—Houston [14th Dist.] 2014, pet. denied)) (emphasis added). "Under subsection E, however, courts may consider conduct *both before and after* the Department removed the child from the home." *Id.* (quoting *In re S.R.*, 452 S.W.3d at 360) (emphasis added).

An endangerment finding often involves physical endangerment, but the statute does not require that the parent's conduct be directed at the child or that the child suffer actual injury." *In re K.J.G.*, No. 04-19-00102-CV, 2019 WL 3937278, at *5 (Tex. App.—San Antonio Aug. 21, 2019, pet. denied) (mem. op.). "Rather, the specific danger to the child's well-being may be inferred from the parent's misconduct alone." *Id.* (citation omitted). "Conduct that subjects a child to a life of uncertainty and instability endangers the physical and emotional well-being of a child." *Id.* "Thus, evidence of illegal drug use by a parent and its effect on a parent's life and her ability to parent may establish an endangering course of conduct under subsection (E)." *Id.*; *In re*

*K-A.B.M.*, 551 S.W.3d 275, 287 (Tex. App.—El Paso 2018, no pet.) ("A parent's use of drugs and its effect on his or her ability to parent may qualify as an endangering course of conduct."); *Walker v. Tex. Dep't of Fam. & Protective Servs.*, 312 S.W.3d 608, 617 (Tex. App.—Houston [1st Dist.] 2009, pet. denied) ("Because it exposes the child to the possibility that the parent may be impaired or imprisoned, illegal drug use may support termination under section 161.001(1)(E).").

### *Endangerment Under Subsection (D)*

In reviewing the subsection (D) findings against Mother and Father, we must determine whether the trial court could have found by clear and convincing evidence that, before the children's removal by the Department, there was at least a single incident in which Mother and Father each knowingly placed or allowed the children to remain in an environment which endangered their physical or emotional well-being. TEX. FAM. CODE ANN. § 161.001(b)(1)(D); *In re C.J.G.*, 2019 WL 5580253, at *3.

The Department's initial investigator in this case, **Edward Sanchez**, testified that on July 3, 2018 the Department received a referral alleging domestic violence by Father against Mother and physical abuse of the children by Father. At that time, T.E.C. was three years old, I.A.C. was one year old, and M.R.C. was only a few months old. Specifically, Father's ten-year old daughter A.C. made an outcry that she saw Father physically assault Mother by beating her with a pole in front of the younger children during an incident in May 2018. A.C. said Father injured her with a wire. A.C. also witnessed Father hitting the younger children for toilet training accidents. Mother denied the "excessive spanking." After initially denying any domestic violence, Mother admitted to Sanchez that Father hit her with a pole or stick in front of the children. He then told them all to get in the car and he drove them to his friend's house where he left them inside the car for hours while he visited his friend. Father was arrested that day and charged with assault against Mother.

A.C. told Sanchez she used to get hit in the past and expressed her fear of Father. A.C. also told Sanchez that Mother and Father had lied to the CPS investigators.

After his investigation, Sanchez found "reason to believe" that an incident of domestic violence occurred between Mother and Father in May 2018 in the presence of the children. Sanchez also found "reason to believe" the allegations of physical abuse against the children. Sanchez testified that Mother was not protective of herself or the children and she did not understand the gravity of the consequences of the family violence assault. Mother minimized Father's assault by saying "he didn't mean it" and was just frustrated. Sanchez stated there were also allegations of Father using illegal drugs such as cocaine and marijuana. Father denied engaging in any domestic violence toward Mother, physical abuse of the children, or illegal drug use. Sanchez stated he did not personally see any injuries on the children during his July 3, 2018 investigation.

Sanchez instituted a safety plan that same day (July 3, 2018) prohibiting Father from returning to the home and from having any unsupervised contact with the children, and requiring Mother to be supervised 24 hours/day in the home by the paternal aunt to ensure Father was not allowed into the home. Sanchez explained the safety plan to Father over the phone because he refused to meet in person; Mother signed the plan in person. In Sanchez's opinion, there were risks of the three children being harmed because they could not protect themselves due to their young age. Sanchez intended to set up family-based services for the family. However, about one week later on the weekend of July 13-14, 2018, the Department received a second referral when M.R.C., the youngest child, suffered a skull fracture while under Mother's unsupervised care, a violation of the safety plan. Mother had left M.R.C. at a cousin's house where he was injured. Sanchez testified that Mother and Father did not take the Department's involvement seriously.

Sanchez's investigation showed that both Mother and Father had "two or more" past CPS investigations involving domestic violence allegations.

San Antonio Police **Officer Joshua Ty Dennis** testified he responded to a family disturbance call on May 16, 2018 based on A.C. calling her paternal grandmother and telling her she was locked inside a vehicle. Officer Dennis arrived in the late evening at a residence and found Father inside drinking with friends while Mother, A.C., T.E.C., I.A.C., and M.R.C. were locked inside a vehicle parked outside the home. Officer Dennis testified they were "fearing for their life [sic] not able to get out;" he could not recall the exact way Father had locked them inside. Officer Dennis observed that Mother's head was bleeding; she also had injuries to her forearm and back. Mother admitted to Officer Dennis that Father hit her with a painting extension rod in front of the children at their home about two hours earlier. Officer Dennis testified it appeared to him that Mother and the children were in fear of Father. Father was arrested that night for family violence assault causing bodily injury. On his own initiative, Officer Dennis applied for a protective order for Mother and the children.

Department investigator **Jessica Sotello** became involved in the case on July 14, 2018 when the hospital made a referral for possible physical abuse of M.R.C. who was being treated for a skull fracture. Sotello reviewed the prior investigation report prepared by Sanchez and learned there was a safety plan in place that prohibited unsupervised contact by Father and Mother with the children. The Department's concerns at that time were Father's drug use (alcohol, marijuana, cocaine, and methamphetamine), physical abuse against the children, and domestic violence against Mother. The report showed Father had been arrested for assault five times, including most recently in May 2018 for assaulting Mother. There were also concerns about Mother physically abusing the children related to toilet training issues.

On the day M.R.C. was injured, Mother told Sotello she left the children at the home of Father's cousin while she went to the grocery store with Father; M.R.C. sustained the skull fracture at the cousin's home.[2] Mother also admitted to Sotello that she was no longer living at her own residence, the approved safety person (the paternal aunt) was no longer supervising her with the children, and she (Mother) was allowing Father to come visit the children daily. Sotello testified those actions by Mother violated the safety plan put in place by Sanchez. Mother and Father took M.R.C. to the hospital; both denied being the one to cause his injury. Sotello testified Mother's version of how long she left the children at her cousin's house did not match the cousin's version. Father refused to meet with Sotello and only spoke to her by phone; he told her if the children were better off in foster care to "do what [she] had to do." Sotello also spoke with A.C. at the hospital. A.C. told Sotello that domestic violence in the home had happened for years and she did not feel safe living with Father and Mother. A.C. also said she was physically injured "due to speaking with the investigator Edward Sanchez." A.C. stated she was "mistreated" by both Mother and Father. A.C. told Sotello she preferred to live with her paternal grandmother and she did not want any visits with Father.

Sotello determined it was in the children's best interest for the Department to remove them that day based on: the injury to M.R.C. which was caused by Mother leaving him with an unapproved caregiver; the parents' violation of the safety plan; Father's refusal to drug test; the history of domestic violence between the parents; and because the parents could not agree on a caregiver for the children. When Sotello informed Mother that the Department was taking custody of the children, Mother called Father to pick her up from the hospital. Sotello testified she did not believe Mother and Father were taking the Department's case seriously. Both had prior CPS

---

[2] Sotello testified the cousin was charged with injury to a child.

history — Mother had "more than two" prior involvements for domestic violence with her as the victim and for neglect of the children, and Father had "four or more" involvements for domestic violence as the perpetrator and for physical abuse of the children. Sotello testified the Department had been working with the family for more than five years as of the date of trial.

Caseworker **Beverly Preciado** testified that in May 2016 she investigated Mother and Father based on a referral for physical neglect, neglectful supervision, and medical neglect of T.E.C. who required oxygen at that time. The allegations of physical and medical neglect were ruled out; the neglectful supervision allegation was based on domestic violence happening around the children, A.C. and T.E.C. Preciado stated there were only two weeks between intake on her case and a prior CPS case which involved Father being charged with domestic violence against Mother and endangering a child. When Preciado received her case, Father had just been released from jail on the domestic violence and endangering charges. Father admitted to Preciado that he had hit Mother; he also admitted there were some domestic violence incidents in the past. Mother admitted being hit by Father in the one incident that led to his charges but stated she had no injuries. Neither stated whether the children were present during the violence. A.C. told Preciado she had witnessed domestic violence between Father and Mother but was unable to give a specific timeframe or recall whether T.E.C. was present. Preciado felt Mother was protective of the children but also testified that Mother's two older children with a different father were living with their father due to issues of domestic violence between Mother and Father. Preciado was ultimately "unable to determine" whether domestic violence had occurred in the children's presence. Mother never indicated she was going to leave Father. When Preciado closed her case in September 2016, she initiated family-based services and recommended services for family violence, parenting, and counseling.

The subsequent caseworker, **Casey Steinau**, testified that, in addition to concerns about domestic violence and physical abuse of the children by Father, there were allegations that Mother was hitting the children. Steinau testified there was a "reason to believe" report from May 2016 noting physical abuse of the children by Mother as well as by Father.

Mother testified at trial and denied any domestic violence in her relationship with Father. She also denied physically abusing the children herself. In his testimony, Father similarly denied being physically violent with Mother or the children. He also denied using illegal drugs.

The trial testimony by Mother and Father denying any domestic violence or physical abuse of the children created a conflict in the evidence for the trial court to resolve based on its assessment of the witnesses' credibility. *See In re C.J.Y.*, No. 04-20-00009-CV, 2020 WL 3441248, at *5 (Tex. App.—San Antonio June 24, 2020, pet. denied) ("[a]s the finder of fact and sole judge of the credibility of the witnesses, the trial court was free to disregard any or all of [the parent's] self-serving testimony."). Based on the conflicting testimony by Officer Dennis and Sanchez that Mother admitted Father hit her with a pole on May 16, 2018 and by Preciado that both Mother and Father admitted he hit her in 2016 and Father admitted similar domestic violence incidents in the past, the trial court could have disbelieved the parents' denials at trial and chosen to believe that more than one incident of domestic violence by Father against Mother occurred prior to removal. The trial court also could have found there were incidents of physical abuse of the children by Father and Mother before the removal date. Further, there was sufficient evidence to support a finding that Mother consciously chose to stay in a violent home environment despite the danger to the children. *See In re J.T.G*, 121 S.W.3d at 125 (a parent's violent conduct creates an environment that endangers the physical and emotional well-being of a child). Thus, we conclude the trial court's findings under subsection (D) against Mother and Father were supported by legally and factually sufficient evidence.

***Endangerment Under Subsection (E)***

In reviewing the findings against Mother and Father under (E), we must determine whether there is clear and convincing evidence, both pre- and post-removal, from which the trial court could have found that each engaged in a voluntary, deliberate, and conscious course of conduct, by acts or omissions, that endangered the children's physical or emotional well-being. TEX. FAM. CODE ANN. § 161.001(b)(1)(E); *In re C.J.G.*, 2019 WL 5580253, at *2.

Despite the denials by Mother and Father at trial about any domestic violence or physical abuse of the children, there was considerable evidence of an ongoing pattern of physical violence by Father toward Mother and by both parents toward the children. Preciado testified that during her 2016 investigation both Mother and Father admitted to an incident of domestic violence in which Father hit Mother. Sanchez testified his July 2018 investigation showed that both Mother and Father had "two or more" past CPS investigations involving domestic violence allegations. Removing caseworker Sotello testified there was an on-going pattern of domestic violence between Father and Mother since 2013. Specifically, Sotello testified that Father's criminal history since 2011 included four family violence assault cases: a 2011 assault-bodily injury/married which was dismissed for a missing witness; a 2013 assault of a family member which was dismissed based on a missing witness; a 2014 assault of a family member which was dismissed; in 2015, charges of aggravated assault and injury to a child (this charge was ultimately rejected) and Father received six months' confinement on the aggravated assault; and an aggravated assault charge in May 2018. Sotello described Father's criminal history as showing a pattern of the same type of domestic violence and a pattern of missing witnesses. Mother has been repeatedly listed as a victim since 2011 and she is still together with Father. According to Sotello, that shows Mother is not protective of the children. In explaining why the continued domestic violence by Father against Mother poses a threat to the children, Sotello stated, "It puts them at risk of injury and

neglect. They continue to witness domestic violence. They could be abused and injured when that occurs as well. They are witnessing everything." Sotello opined that witnessing domestic violence between their parents causes children emotional harm.

In addition, Steinau stated there has been an on-going pattern of domestic violence over the 18-month to two-year course of this case. Steinau testified that the last reported incident of domestic violence in the home was in April 2019, after both Mother and Father had completed domestic violence, couples counseling, and parenting classes. Steinau testified, "I have been working the case for 18 months and the behaviors of the parents have not changed. The children are at risk for neglect and abuse by both of the parents . . . ." In her testimony, Mother stated she would never leave Father. Steinau also testified that T.E.C. does not feel safe in the home with Mother and Father and does not want to return there because he is afraid of the violence.

The on-going domestic violence in her relationship with Father for the last five years is evidence of a course of conduct by Mother in which she has failed to provide a safe, secure, and stable home environment for the children and has instead endangered their physical and emotional well-being. *See In re K.J.G.*, 2019 WL 3937278, at \*5 (parent's conduct that subjects child to a life of uncertainty and instability endangers the child's physical and emotional well-being); *see also In re J.T.G*, 121 S.W.3d at 125 (violent conduct by a parent can create an environment that endangers the physical and/or emotional well-being of a child). Based on the above evidence, the trial court could have concluded that Mother's course of conduct before and during the case showed that she was either not willing to or incapable of protecting the children from the danger and instability present in their home life with Father. The evidence showed that Mother lacks sufficient protective capabilities toward the children and has engaged in physical abuse against them herself. The disputed evidence is not so significant that the trial court could not have found by clear and convincing evidence that Mother engaged in a conscious course of conduct that

endangered the children by staying in a relationship with Father that involved a pattern of domestic violence and by engaging in physical abuse of the children herself.

As to Father, despite his denials at trial, there is substantial evidence that he has engaged in an on-going pattern of domestic violence against Mother since 2011 which continued during this case. In addition to the caseworkers' testimony, his criminal history shows multiple arrests for family violence assaults with the most recent arrest for assault against Mother occurring at the beginning of this case. Another incident in April 2019 occurred during the case after the completion of domestic violence classes. There is evidence that the children have witnessed the violence against Mother; in particular, T.E.C. expressed his fear of returning to Mother and Father. According to the caseworkers' testimony, A.C. informed them that Father also physically abuses the children.

We conclude that the trial court could have found by clear and convincing evidence that Father engaged in a voluntary, deliberate, and conscious course of conduct by engaging in violence against Mother and the children and that his actions endangered the children's physical or emotional well-being. *See* TEX. FAM. CODE ANN. § 161.001(b)(E).[3]

We therefore hold the evidence is both legally and factually sufficient to support the trial court's endangerment findings under subsection (E) as to both Mother and Father.

### OTHER PREDICATE GROUNDS

Having concluded that legally and factually sufficient evidence exists to support the trial court's findings under subsections (D) and (E) as to both Mother and Father, we need not address their appellate issues related to the trial court's findings of other predicate grounds. *See In re A.V.*,

---

[3] Father argues that the trial court's decision to abate the case from January to June 2020, and to impose additional family services including additional domestic violence classes, "creates a strong implication" that the trial court believed the evidence presented so far did not support endangerment findings under (D) or (E). We disagree. The trial court did not specify a reason for the abatement and we decline to speculate.

- 14 -

113 S.W.3d 355, 362 (Tex. 2003) (only one statutory ground is necessary to support a judgment terminating parental rights when there is also a finding that termination is in the child's best interest).

**BEST INTERESTS OF THE CHILDREN**

Only Mother challenges the trial court's best interest finding. Specifically, Mother asserts the evidence is legally and factually insufficient to support the trial court's findings that termination of their parental rights is in the best interests of the children. *See* TEX. FAM. CODE ANN. § 161.001(b)(2). Under Texas law, there is a strong presumption that the best interest of a child is served by keeping the child with a parent. *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006). In determining whether the child's parent is willing and able to provide the child with a safe environment, a court should consider the factors set out in section 263.307 of the Family Code. *See* TEX. FAM. CODE ANN. § 263.307(b).[4] In addition to these statutory factors, in considering the best interest of the child, a court may also consider the nonexclusive list of factors set forth by the Texas Supreme Court in *Holley v. Adams*, 544 S.W.2d 367, 372 (Tex. 1976).[5] The *Holley* factors

---

[4] These factors include (1) the child's age and physical and mental vulnerabilities; (2) the frequency and nature of out-of-home placements; (3) the magnitude, frequency, and circumstances of the harm to the child; (4) whether the child has been the victim of repeated harm after the initial report and intervention by the Department; (5) whether the child is fearful of living in or returning to the child's home; (6) the results of psychiatric, psychological, or developmental evaluations of the child, the child's parents, other family members, or others who have access to the child's home; (7) whether there is a history of abusive or assaultive conduct by the child's family or others who have access to the child's home; (8) whether there is a history of substance abuse by the child's family or others who have access to the child's home; (9) whether the perpetrator of the harm to the child is identified; (10) the willingness and ability of the child's family to seek out, accept, and complete counseling services and to cooperate with and facilitate an appropriate agency's close supervision; (11) the willingness and ability of the child's family to effect positive environmental and personal changes within a reasonable period of time; (12) whether the child's family demonstrates adequate parenting skills, including providing the child and other children under the family's care with: (A) minimally adequate health and nutritional care; (B) care, nurturance, and appropriate discipline consistent with the child's physical and psychological development; (C) guidance and supervision consistent with the child's safety; (D) a safe physical home environment; (E) protection from repeated exposure to violence even though the violence may not be directed at the child; and (F) an understanding of the child's needs and capabilities; and (13) whether an adequate social support system consisting of an extended family and friends is available to the child. TEX. FAM. CODE ANN. § 263.307(b).

[5] These factors include, but are not limited to, the following: (1) the child's desires; (2) the child's present and future emotional and physical needs; (3) any present or future emotional and physical danger to the child; (4) the parental abilities of the individuals seeking custody; (5) the programs available to assist these individuals to promote the child's best interest; (6) the plans for the child by these individuals or by the agency seeking custody; (7) the stability of the

are neither all-encompassing nor does a court need to find evidence of each factor before terminating the parent-child relationship. *See In re C.H.*, 89 S.W.3d 17, 27 (Tex. 2002). In determining whether termination of the parent-child relationship is in the best interest of a child, a court may judge a parent's future conduct by his or her past conduct. *In re E.D.*, 419 S.W.3d 615, 620 (Tex. App.—San Antonio 2013, pet. denied). Finally, evidence establishing one or more of the statutory grounds for termination may also be probative of best interest, although it does not relieve the Department of its burden to prove best interest. *In re C.H.*, 89 S.W.3d at 28.

Here, as discussed above, there is clear and convincing evidence that both Mother and Father have been and remain engaged in a course of conduct that endangers the children's physical and emotional well-being due to an on-going pattern of domestic violence in the home. They have a significant past CPS history based on allegations of domestic violence and physical abuse of the children. As noted above, Mother's two older children with another father live with him due to concerns about domestic violence between Father and Mother. Father's parental rights to his oldest daughter A.C. were recently terminated. Father's criminal history shows repeated arrests for assault-family violence, of which several were against Mother. The children, T.E.C., I.A.C., and M.R.C., are young and unable to protect themselves. These factors weigh in favor of termination being in the children's best interest. *See* TEX. FAM. CODE ANN. § 263.307(b)(1), (3), (7), (9), (12)(D), (E).

Mother and Father testified they love their children and want them returned. Steinau testified that during the in-person visits she observed right after removal in July/August 2018 the children appeared happy to see their parents. Toward the end of the case, the children were initially

---

home or proposed placement; (8) the parent's acts or omissions that may indicate the existing parent-child relationship is improper; and (9) any excuse for the parent's acts or omissions. *In re E.C.R.*, 402 S.W.3d 239, 249 n.9 (Tex. 2013) (citing *Holley*, 544 S.W.2d at 371-72).

happy to see their parents but appeared to lose interest during the visits. Because the parents were compliant with their family service plan, their visits with the children were increased to three hours supervised in the home in November 2018 and then to weekends in the home with some unsupervised periods in March 2019. In May 2019, the Department allowed overnight visits with the parents. However, the overnight visits were stopped in mid-June 2019 due to new allegations of physical abuse by Father against Mother. During 2020, the parent visits were conducted virtually. Mother did tell Steinau in 2018 and in December 2019 that she was going to leave Father, but she never did. Mother continued living with Father during the case and she was still living with him during the trial.

With respect to whether Mother has the parental abilities to meet the children's needs, Steinau testified she does not believe that Mother has sufficient protective abilities to put their needs and safety first. While Mother completed the services offered during the case, she did not make the necessary changes in her behavior and parental abilities. Steinau testified, "Classes have been ongoing for 18 months. There has been continued concerns regarding domestic violence, physical abuse between the mother and the father and of the children in the case as allegations were validated with reason to believe ... as recent as August of 2019[,] 13-14 months after the case began." Steinau stated the August 2019 report was for physical abuse between Mother and Father and by Mother against T.E.C. Mother completed domestic violence class at the end of 2018, but did not complete the additional domestic violence class ordered after the August 2019 report. These factors weigh in favor of termination of Mother's rights. *See Holly*, 544 S.W.2d at 371-72 (factors (4), (7), (8)).

The children have made good progress in their physical and emotional development while living with Intervenors. They have all thrived and are meeting appropriate milestones. I.A.C. and M.R.C. were placed there in October 2018, and T.E.C. and A.C. were placed there in April 2019.

According to Steinau, when M.R.C. arrived at Intervenors' home he was underweight and I.A.C. was very timid, nonverbal, and cried a lot. When T.E.C. arrived, he cried a lot, did not make eye contact or engage with others, and seemed very fearful of people in general. He did not know his colors or letters and could not do basic tasks like throwing a ball. Steinau visited every two weeks and observed the interactions between Intervenors and the children over time. Steinau testified that now one-year old M.RC. is strongly bonded to Intervenors and cries when one of them leaves the room. Three-year old I.A.C. has become a "happy little girl," speaks in sentences, and freely gives and receives affection to and from Intervenors and Steinau. Five-year old T.E.C. has become very responsive to his caregivers, listens well, has good manners, and follows instructions. He has done "very, very well as far as his academics and as far as his learning development." T.E.C. has expressed his desire to continue living with Intervenors. T.E.C. does not want to return to his parents' home because he is fearful of the physical violence. He has told Steinau at times that he does not want to see Mother and Father. Steinau testified if T.E.C. was returned to his parents, he would regress.

Steinau stated the Intervenors take the children to school and day care and to medical appointments as needed, the children have sufficient food and clothing, and the Intervenors' home is clean and free of dangerous conditions. Steinau testified the Intervenors are able to meet the emotional and physical needs of all the children and to provide a stable home environment, while Mother and Father cannot. Intervenors have demonstrated the ability to parent the children, while Mother and Father have not. Steinau testified the Intervenors "have gone above and beyond for these children" and are "very loving and kind caregivers." All three children (along with A.C. who is also placed there) have bonded with Intervenors. Further, the four children are strongly bonded with each other. The Department's plan is for Intervenors to adopt T.E.C., I.A.C., and M.R.C. These factors weigh in favor of termination of Mother's parental rights being in the

children's best interest. *See* TEX. FAM. CODE ANN. § 263.307(b)(5); *Holly*, 544 S.W.2d at 371-72 (factors (1)-(3), (6), (7)).

Steinau testified the biggest barriers to returning the children to Mother are her denials of any domestic violence, her own physical abuse of the children, and her lack of protective capacities toward the children. The Department has ongoing concerns about domestic violence in the home with the children present. Steinau testified the same dangers existed at the end of trial as existed when the children came into the Department's care two years' earlier, as well as when the Department first became involved with the family five years ago. Mother is not able to provide a stable and safe home environment for the children.

The evidence of on-going domestic violence in the home and Mother's refusal or inability to protect herself and the children from Father's violence, along with her failure to make sufficient changes in her own behavior, including physical abuse of the children, supports a finding that termination of her parental rights is in the children's best interest. The main concerns that led to the Department's involvement in this case in July 2018 persisted at the end of the case in June 2020. When considered along with the young children's needs for a safe, stable, and nurturing home environment, this evidence is legally and factually sufficient to support the trial court's best-interest finding with respect to Mother.[6]

## CONSERVATORSHIP

Finally, Mother asserts that if the termination order is reversed, the issue of conservatorship of the children should be reconsidered. Because we are affirming the trial court's termination order, we need not address the conservatorship issue. *See In re C.J.Y.*, 2020 WL 3441248, at *7.

---

[6] Although the Department continued to have concerns about illegal drug use by Father during the case, in light of the substantial evidence of on-going domestic violence and physical abuse, we do not address this additional concern.

## CONCLUSION

Based on the foregoing reasons, we affirm the trial court's order terminating the parental rights of Mother and Father.

Liza A. Rodriguez, Justice